Good morning, Your Honors. May it please the Court, my name is Jessica Yates, Counsel for Appellant Balbo Rents. I'd like to reserve three minutes for rebuttal, if possible. Although this case started out with a number of issues and claims, on appeal there really is only one thing for this Court to focus on, which is whether it is right and correct under Nevada law to pierce the corporate veil in this case and hold defendants responsible for the $10 million judgment entered against their corporate entities. It's a simple alter ego claim, not fraud, not misrepresentation. Now the District Court thought about this case differently. He wanted to see a scam, evidence of let's cheat Volvo, evidence of intentional wrongdoing. Those are direct quotes from the trial transcript in terms of what he was looking for. But Nevada law has a different standard about whether there's simply evidence of manifest injustice, not necessarily fraud. And we believe that standard was met in this case. I do want to orient the Court to a few key facts, knowing that you've read the briefs. But just talking about the problem in this case, starting with the creation of B&I, the defendant's entity that was created to invest in the Las Vegas franchise. They represented that they would be investing $840,000 in B&I as the majority member of the Las Vegas franchise. And on that basis, VFS advanced a $6.4 million loan, and B&I guaranteed that loan. However, that was an illusory guarantee because there was no capital, no equity, no bank account. It was a similar situation with San Antonio. Again, the Bosworths, Marcel and Dwight, as 56% aggregate owners, had committed to investing $500,000 into the San Antonio enterprise. And there were cross-guarantees between San Antonio and the Vegas franchises. Again, illusory because they didn't invest any capital or any equity, even though VFS was advancing $4.1 million on the assumption and their commitment to make that investment. So is it your position that undercapitalization under Nevada law alone is sufficient to pierce the corporate veil? No, Your Honor. It isn't our position that undercapitalization alone would be sufficient. We do believe, though, there was ample other evidence in terms of both the unity of interest, in terms of shareholder control and manifest injustice, the three elements under Nevada law that the corporate veil should have been pierced in this case. I do want to sort of point out in terms of undercapitalization, obviously there's undercapitalization and then there's no capitalization. And this is a case where there is no capitalization. This isn't a matter of should they have invested more. They actually didn't invest any. And that was a very significant factor in Lorenz and the Polaris cases. And in this Court's case in Topworth, when you have just zero capitalization, showing of a deliberate intention to not invest any amount of money in the enterprise, yet inducing others to extend financing on that basis. I also want to talk for a moment about that other evidence that I mentioned, the factors of diversion of assets, treating assets as one own, commingling, very significant evidence in this case that was really not sort of dealt with by the district court. The defendants admitted on appeal that the funds in the bank accounts that did exist, and even just on the books for those companies that didn't have bank accounts, showed that the funds were being transferred freely among the entities. That's an admission of theirs on appeal, including BNI. Now, the district court had adopted their proposed findings on a wholesale basis. And one of those findings was that there was no evidence of diversion of assets. And that was flatly wrong. There was evidence. We detail on pages 14 and 15 of our opening brief transfers of $10,000, unexplained transfers from NRL entities to the Tarrant County Marina. A $156,000, quote, loan to go to expand a marina. Why is NRL, that's underwater, making a loan to expand a marina? These are things that should have been addressed by the district court. Instead, the court seemed to think that, well, as long as there's an explanation and as long as there's an attempt to repay, then these don't matter for purposes of alter ego claim. And that's not Nevada law. Instead, well, for one thing, there actually was evidence that the loans weren't fully repaid. But setting that aside, it's the question of whether the commingling is so pervasive and the diversions and the treating assets as interchangeable among other companies is so pervasive that they have completely disregarded the corporate form and the protections that go along with the corporate form. Those protections are a privilege under law, not a right. There's not an absolute right to be able to use the corporate form and not be held liable for the debts that are incurred by your corporation. And if you treat all the corporations as not having any individual identities, as though the assets are interchangeable, then the corporate form needs to be disregarded under Nevada law and the veil should be pierced. Counsel, there's a note on your brief on page 27 that suggests possibly Texas law could apply. What if we were to conclude that, indeed, under Nevada law, you look to the state incorporation of the various entities to determine what the choice of law purpose is? And if we determine that under Nevada law that actually Texas law should apply to the various Texas entities, how does your analysis change? Your Honor, we did look at that. In terms of what was actually tried below, I think the parties ended up agreeing that it was the same result. And so that's how we looked at that on appeal. There didn't seem to be any material difference in Texas law. And in terms of the evidence that was presented in this case, the veil would be pierced under Texas law as well. One of the arguments that you make in your brief is that the district court erred by not or by requiring, in a sense, my words, a fraud element before you can pierce the veil. Is that true under Texas law? Or don't you have to have some sort of fraud or deception to pierce the veil under Texas law? Your Honor, I believe that when the parties looked at this below and briefed it, they determined that it wasn't required to have a finding of fraud. This kind of manifest injustice certainly is a similar kind of concept of are you doing something and holding yourself out in a way that causes other people to act as if you have a legitimate corporation when, in fact, you don't. And I think that it's a similar standard under Texas law. We actually do believe that the evidence would support, in fact, a fraud finding if that law was applied because there were representations made and commitments in terms of investing at least a certain amount of equity. And here we do have a situation where defendants say, well, we never promised a certain amount. And that really isn't the point. This isn't a case about compliance with loan conditions or investing a certain amount. It's the fact that they invested zero. And that is really where, from a veil-piercing perspective, you do hold them accountable, not so much as damages liability for fraud. That would be a completely different case. Instead, you're holding them accountable for corporate debt that they promised to repay through their entities. Counsel, wasn't your client primarily dealing with some guy named Bali and not the Bosworths? They had been dealing, at least some, with the Bosworths. But I think what's really clear here is, you know, veil-piercing isn't necessarily about holding the manager of the LLC responsible. Instead, it's about holding shareholders responsible. And they were definitely shareholders and, in fact, the controlling shareholders. They had complete control over the financial viability of both the Vegas and the San Antonio enterprises because they held the cards to all of the financing. They were supposed to be committing all of the equity, and they ended up using these short-term loans to help them make payroll. This is one of the admissions of their brief. As they knew they couldn't make payroll, they didn't have enough money, so they would send enough money in to make payroll. And then as soon as a bit of cash came in, they would pull that money back. Well, you've got to pierce a couple of veils in Nevada. I mean, you've got, first of all, the B&I that owns 60 percent and then the shareholders behind B&I, so you have to pierce a couple of veils to get to the actual shareholders, true? Well, Your Honor, actually, B&I was held responsible for that $10 million judgment because it had breached its guarantee. So they just need to pierce that. But in Texas, you have a limited partnership arrangement. What difference does that make? Well, in terms of the Texas law, we actually don't think it makes any difference. In terms of getting through the guarantee, B&I, whether you consider under Texas or Nevada law, did make a guarantee. I'm actually talking about the Texas entities now, not B&I. Okay, San Antonio. So in terms of San Antonio, there were cross-guarantees. San Antonio guaranteed the Las Vegas debt, and so it actually is still held liable for that purpose. And so there's not a double piercing there. It breached its own guarantee. I guess my question was somewhat different. I mean, as I understand it, NRL San Antonio is a limited partnership, not an LLC, true? That's my understanding, Your Honor. Yeah, so what difference does that make under Texas law? We don't believe that there is any distinction in terms of the standard of bail piercing, if that's your question. Yes. In terms of whether it be corporation or LLC or a limited partnership, the standard is certainly the same, is our understanding. Okay. I want to just mention for a moment, because I don't think we've talked about shareholder influence in governance, and this was something that I think was disputed by the defendants. This is a situation where they have actually admitted on appeal that B&I did have the ability to influence and control the Las Vegas franchise. So that was an admission that they made. It's also something that we want to make sure the court focuses on. There is not just evidence of direct control, but evidence of a deliberate decision to not invest in these entities. And given the power, the financial power that the defendants had over the entities, the absence of taking action is as much influence and control as taking action. That was a decision to not capitalize B&I, to not capitalize San Antonio. And that was, in fact, their decision is evidenced in particular by that $149,000 transfer that they made to demonstrate to VFS, oh, yes, we're making an investment, and they pulled it back the very next day. Again, a deliberate decision on their part. You're down to about three minutes. Do you want to reserve? That would be lovely. Thanks. Good morning, Your Honors. My name is Terry Kerr from the firm of McDonnell, Corona-Wilson in Las Vegas. Your Honor, let me begin with this, if I could, please. We agree that neither the statute nor case law requires fraud, but in that third element, under Nevada law, to demonstrate alter ego, that either it would sanction a fraud or adhere to a manifest injustice. I don't know for sure, but the court never said you have to show fraud. The words that the court used repeatedly were intentional wrongdoing. That goes to that third factor, manifest injustice, because I think what the court was saying, and what the cases indicate to me that were relied upon by Volvo, is that in order to have a manifest injustice, you're going to have to have some sort of intentional wrongdoing. The cases that they cite, LFC is one, Polaris is one, and the other one is the Lorenz case. In all of those cases, the circumstances are quite egregious, where somebody was engaged in some sort of activity, and the inability for the judgment creditor or the plaintiff or whoever to recover anything was a result of what clearly was somebody making an effort to do something to frustrate any attempt for the plaintiff or the creditor to receive what he or she was otherwise entitled to. That's what I think the court was saying, is you haven't shown us any sort of intentional wrongdoing. I mean, the other factors aside, the unity of interest in ownership and the influence in governance, there's still no manifest injustice here. I think that's what the court was saying. We would agree with them. The statute, neither the statute nor the cases require fraud, but there's no conduct here that would lead to a manifest injustice, which caused the injury or the inability for Volvo to collect anything. There's something that needs to be said here, too, Your Honor. There's a gentleman by the name of Martin Moore, and we talk about him in our brief. Martin Moore was a vice president for Volvo, and he said in his deposition testimony, which was submitted at trial, that in the year late 2007 was a very rough year for the construction industry and that a number of franchises had had difficulties making payments and that many of them had had to restructure themselves. Those are the words from Volvo itself. Now, keep in mind, the NRL franchise in Las Vegas opened its doors in roughly January of 2005. San Antonio comes in March, I think, of 2006. Martin Moore, Volvo is talking about late 2007. I think the court would take judicial notice that the Great Recession caused a lot of casualties. That's the real reason that these two franchises failed. That's it right there. And those are the words from Volvo itself. I do want to talk to, I think it was Judge Collins who asked about the control of these entities and this gentleman by the name of Mr. Bob Bolley. Mr. Bob Bolley was high school friends with the Bosworth brothers. They had a relationship that goes way back to their use in Texas. But even Barry Natwick, and we cited to this in our brief, Barry Natwick was the president of Volvo, and he testified at trial that Mr. Bolley was the operator of both of these franchises. He even went further. He testified that neither Bosworth controlled any one of these entities. So right there, I mean, so sure, B&I owned 60% of the franchise in Las Vegas. They owned 58% of the franchise in San Antonio. But Mr. Bolley was recognized by Volvo as the operator or the controller, if you will, of both of these entities and not the Bosworths. That's especially obvious in the e-mail exchange between Mr. Natwick and Mr. Marcel Bosworth. It's in our supplemental excerpt of record where there are discussions that the Bosworths were involved in with Volvo, largely dealing with some equipment that arrived at the San Antonio franchise location without being ordered by Mr. Bolley. That was the contention anyway. And so there's this meeting. And in that e-mail, you can see that Mr. Bosworth is saying, Marcel Bosworth is saying to Mr. Natwick, you'll have to talk to Bob. Things need to be worked out. You'll have to talk to Bob. I'm paraphrasing now, but that's not an exact quote. That's basically what he's saying. And on the e-mail, he even signs off as Marcel Bosworth from Marine Quest, not from anybody else, Marine Quest. That was the basic corporation they had in Texas that the two brothers owned 50-50 that ran the other 17, whatever it was, Bosworth Marine Quest entities. So, number one, and I have to hammer this home, there's no manifest injustice here. These franchises went down because the recession took them down. Well, there were. I think it's a fair inference from the record that they were undercapitalized. Do you agree with that? Well, yeah. Let's take them one at a time, Your Honor. Volvo is relying on what was actually, if you look at the document, it says an estimated plan. And that's the one where Marcel Bosworth says, what was it, I think it's $400,000 or $450,000 in cash and then the rest in equipment. But he submits that to Volvo, although the loan doesn't come from Volvo. It comes from Volvo Financial Services. The franchise agreement has already been approved. But anyway, he did say that. He did submit that. Now, if the court is asking, well, how much of that did Bosworth actually put in or B&I put into the operation in Las Vegas, we admit there's no factual dispute here. B&I did not have a bank account. There's nothing to show that B&I itself directly infused funds into the operation in Las Vegas. However, there's a gentleman by the name of Doug Taylor. Doug Taylor is from Volvo. He's the gentleman who undertook the equity analysis a couple of years later to determine what happened here. And he even said in his testimony that he did not include in any equity calculation the equipment that came into, talking about the Las Vegas operation, the equipment. And the figure that pops up in that testimony is $300,000. But he wasn't sure. But he just said, I didn't count that. And then later their own expert, a gentleman by the name of George Schwartz, testifies, the forensic expert testifies, that equipment would constitute equity. So it's very sloppy. It is true they didn't have a bank account. They didn't put capital directly into it. I think what we said in our findings of fact and conclusions of law, that B&I did not directly put the money in, put money in, but that there were contributions made by the Bosworths, I think we said on behalf of B&I. The point is, the Bosworths said, we're going to commit, and the Bosworths put something in there. How much isn't quite clear. It didn't come directly from B&I. That's true. Now, as to San Antonio, B&I is not involved in San Antonio. But the Bosworths are. And you may have seen, Your Honors, the e-mail exchange between a guy named Mike Usher and Mr. Bali about, okay, the figure is supposed to be $500,000. I see that you've got up to, I don't remember what it is, close to $400,000. Where is the rest of it? And so Bali, not Volvo, Bali goes to Marcel Bosworth and says, I need to show Volvo that you've got this money available to put into the franchise. That's in summation what he said.  And he says, okay, I'll do it, but I need it right back. All right? That's just, if you want me to show that I've got the money available, I'll do it. He puts it in. He takes it out. Is that the $149,000 that you were talking about? That's the $149,000, yes, Your Honor. That's correct. So they want to make Volvo think that the money is there, and the very next day they take it out. But they don't tell Volvo it's just a sham loan or something like that? Your Honor, let me put it to you this way. Again, the correspondence is between Bali and Mike Usher from Volvo, not Marcel and Usher. Now, it is true, Marcel is copied on an e-mail here. But Marcel is saying, basically, well, look, you can see this is what we put in so far. I'll be able to show Volvo that I've got this money, but you have to understand, Bob, I need it right back. So he takes it back the next day or something like that. There's no fraudulent intent there. Mr. Bosworth is under the impression, because he hasn't talked to Volvo, he just has to show him he's got the money available, and that's what he does. But that would be maybe undercapitalization, not no capitalization, because in that same e-mail exchange, there's an acknowledgment from Volvo that the San Antonio operation has been capitalized to some extent. That goes to undercapitalization. Let me ask you the choice of law question, because that's not particularly addressed in the briefs, and I know it was the subject of some motions early in the case. If Texas law applies to the Texas entities, do you agree with your opposing counsel that the result is not altered? Here's what I can tell you, Your Honor. I do recall, it wasn't Ms. Yates, it was another gentleman, I think, Mr. Kilroy or maybe Mr. Gaffney here, somebody, and for the life of me, I don't know who did the analysis. We did it or they did it, but we both had an opportunity to review it, and we came to the same conclusion that it wouldn't make any difference. That was more than two and a half years ago, and I honestly don't recall. I think we probably said it's not going to make any difference, so why raise it with the court? And we left it at that. I would agree with Ms. Yates on that. It seems to me that there is a difference, but that's something that if we, I suppose, if it turns out to be a decision point that we can have you provide some supplemental briefing if you want. Yes, Your Honor. There's one other thing, too, about undercapitalization, if I may. I think it's in the North Arlington case that I cited. When it talks about it, the judge said, or Volvo would say, that the judge was wrong to adopt what we put in the draft findings of fact and conclusions of law, that the test here is that were the corporations set up to fail? And they say, we relied, we cited on a New York bankruptcy court case. But the North Arlington case, maybe we simply could have said that they were not set up as shams. That language is in the Nevada Supreme Court case. But it's probably the same thing. Set up for failure, sham, what's the difference? So I think we're fundamentally correct with what we put and what the court adopted with that language on undercapitalization. I would disagree with zero capitalization. We did capitalize. We would agree with the judge. It was pretty sloppy. These are small businessmen, and I think the Boswers were entrusting Bali to take care of a lot of this stuff, and a lot of the Ts weren't crossed. But that doesn't lead to satisfaction of the three required elements for alter ego under Nevada law. Certainly, there's no resulting manifest injustice here. Now, there was a disregard of the corporate form, I would say. I mean, you have direct investments by entities. You didn't have a bank account in the primary shareholder. Direct investments by the shareholder of that entity's money is moving in and out of accounts. It's not a pretty picture. No, it's not, Your Honor. The money moving in and out of the accounts, and a lot of that is contained in the equity analysis I mentioned by Mr. Taylor. Those are, by and large, loans, some of them documented, some of them maybe not. Let me take, for example, the Ms. Yates mentioned the I think it's $154,000 or something that went from NRL to assist the Boswars in paying for a marina. But there's also an e-mail exchange in the documents on the record where a woman by the name of Sherry Whatley, who was a bookkeeper for the Boswars in Texas, is explaining to I think it's Jennifer Moore, the accountant, or Tracy Woods Hanford, the accountant for the Boswars, that, well, here, yeah, we see that, you can see right here that $149,000 or $150,000 of it has been repaid. It's pretty sloppy, but it's still an arm's-length transaction. Okay, so they borrowed the money, maybe not a wise thing to do, but it was paid back. At least, according to that e-mail, almost all of it was paid back. There's reference made, I think, by Valdo to unexplained transfers, but it doesn't go any deeper than that. We would take the point of view, the Boswars were not asked at trial, that there's probably an explanation somewhere, but all of these were carried on the books as the transfers. They're not hidden under a table anywhere. They're all documented by the accountants. They show money in, money out, where it went, this and that and the other. But many of the transfers from the NRL entities, primarily Las Vegas, to the Boswars are repayment of loans. They're documented. We've submitted those. Well, those were all exhibits at trial. I see that I've got a minute left, Your Honor. Again, if the Court would look at those three cases in particular, the LCF or LFC, the Lorenz case and the Polaris case, in those cases, I mean, there was really, you can't call it anything but intentional wrongdoing. And the Court discusses, you still have to have that third element, manifest injustice, and because of the conduct over here, this party was injured over here, not fraud, just a manifest injustice. It's really intentional wrongdoing. The Court, perhaps, could have been a little more articulate, but I think that's what the Court was saying. In fact, I'll just, the Court makes reference to the Caples case. That's a 1974 case. It's in that case where the Court talks about the conduct amounted to willful fraud. Now, maybe that's where Judge Mahan got that in his mind, that you had to have something, or it actually says unconscionable conduct as well. Maybe that's what the judge was thinking. But we're satisfied that you just can't get the corporations, can't pierce those nails. I'm out of time, Your Honor, but I'll take any questions if you have any. Thank you, counsel. Thank you, Your Honor. We hear a rebuttal. Your Honors, I do recall that there was a similar stipulation about that Texas law would really do the same result. We probably did not include in our record excerpts the brief that we did on choice of law that came to that conclusion. It's available to us, though. I'm sorry? It's available to us. Okay. All right. So you're aware of that. In terms of the impact of the recession, we have found no case indicating that veil piercing doesn't apply in a recession. This happens all the time, that businesses in business cycles come and go and fail. That doesn't mean that veil piercing doesn't apply. And we show in our brief the facts that as early as 2006 there was negative capitalization. These companies were in trouble well before the 2007-2008 recession. We also wanted to talk a little bit about the idea of equipment. For one thing, B&I, and it was admitted, B&I had no capitalization, including no equipment, because, of course, B&I had no actual business operations, so there was no equipment invested there. But in any event, this was a halftime motion. So they didn't have any evidence put on about what equipment they supposedly invested. All they did was cross-examine a Volvo rents auditor and said, well, did you include equipment? He said, well, no. But he added, and this is part of a reply brief, that even under the most generous assumptions of what equipment could have been invested, there was still negative equity. I also want to mention in terms of what the district court found in undercapitalization, he did say in his findings, and these, of course, were proposed by the defendants, that the NRL entities may have been undercapitalized, may have been undercapitalized, I believe was his quote, but it wasn't the fault of the Bosworths. And that clearly was an erroneous finding, not on the undercapitalization part, which apparently was one of their concessions, but on whose fault it was. Clearly, they did have the authority and the obligation as major shareholders of both of these companies to capitalize the entities, and they didn't do that. I also want to mention a couple of things about the cases that they cite, and they want to draw your attention to, specifically the Lorenz case. They say, well, that clearly requires intentional wrongdoing. But assuming that that's true, look at those facts, because what the court and Lorenz blamed the defendants for is they actually posted illusory security. They supposedly capitalized their company with a note that was backed by real property, but that property was under foreclosure. We have illusory guarantees here as well by BNI, and it's completely analogous. Your Honors, I see I'm running out of time, but I'm happy to answer any questions. Any further questions?  Thank you both for your arguments. The case just heard will be submitted for decision.
judges: Thomas, Owens, Collins